IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PAUL DUNKLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-128-WDS |
| | ) | |
| CONTEMPRI HOMES; | ) | |
| RICK POWELL; and JOHN MURPHY | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff, Paul Dunklin, by his attorney, Richard Fedder and, for his

Complaint against Contempri Homes ("Contempri"), Rick Powell, and John Murphy states:

### JURISDICTION AND VENUE

This Complaint is brought pursuant to "Title VII" of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et. seq.*; and Illinois common law.  Jurisdiction is founded on 28 U.S.C. §§ 1331

and 1343(a)(3) and the aforementioned statutory and constitutional provisions.  Plaintiffs further

invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider

claims arising under state law.

Venue in this Court exists and is proper pursuant to 28 U.S.C. § 1391 (b) and (c) in that

the Defendant Contempri conducts substantial business in the Southern District of Illinois, the

Defendant Mr. Powell lives and works in the Southern District of Illinois, and the events and

omissions giving rise to Plaintiff's claim occurred within the Southern District of Illinois.

### DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a jury trial.

## PARTIES

1. Plaintiff Paul Dunklin is a citizen of the United States, and a resident of Pinckneyville, in Perry County, Illinois.  He has worked for Contempri for approximately three years.

2. Defendant Contempri Homes is a private corporation, which manufactures and sells prefabricated homes.  It does a substantial amount of its business in the State of Illinois.

3. Defendant Rick Powell is a citizen of the State of Illinois and a resident of Southern Illinois.  He has been an employee of Contempri for the past three years.

4. Defendant John Murphy is a citizen of the State of Illinois and a resident of Southern Illinois.  He has been president of Contempri for the past two years.

## FACTUAL ALLEGATIONS AND BASIS FOR CLAIM

5.  Paul Dunklin is an African-American (hereinafter "black") man.

6. Contempri Homes makes pre-manufactured houses, which it delivers and installs at various sites, both locally and nationally.

7. In January, 2004, the temporary jobs firm, Extra Help, sent Mr. Dunklin and Rob Mathis to Contempri as temporary workers.

8. Mr. Dunklin was hired by Contempri primarily to do work in the painting department and to be a "flagger."

9. Mr. Mathis was hired the same day and asked to work primarily with the "set crew".

10. Mr. Dunklin is black.  Mr. Mathis is white.

11. They were both hired at the rate of $9 per hour.

12. The job of flagging entails driving a small truck to accompany the big truck ("semi") which carries the pre-manufactured home to its destination.  The flag truck is used to warn other motorists of the oversized load.

13. Flagging is not a full-time job at Contempri.  It is an occasional job.  During the time that Mr. Dunklin has worked there, Contempri has generally had two or three persons who flag.  They all have done other work at the plant.

14. Contempri put Mr. Dunklin to work at a variety of jobs at the plant.  This included work inside the plant, primarily sanding, painting, and plastering, and work in the yard, primarily chaining the houses down, jacking them up, and putting protective OSB strips on the siding of the homes, as well as taking care of general yard maintenance.

15. From the beginning, Mr. Dunklin was considered by his supervisors to be a good worker.

16. After a few months working as temporary workers, both he and Mr. Mathis were hired on by Contempri as regular employees.  Their wages were then raised to $10 per hour.

17. For most of the time covered by this lawsuit, Mr. Dunklin was the only non-temporary black employee, hired by Contempri to work at the Pinkneyville plant.  Sometimes a black worker from the temporary service would work at Contempri for a few weeks.  There was also another black worker in a different department, who was inactive due to injury for most of the time period covered by this lawsuit.

18. Until March 2005, Mr. Dunklin spent half or more of his day working inside the plant, mostly in the painting department.

19. His supervisor in the painting department was Lloyd White.  Prior to March 2005, Mr. White considered Mr. Dunklin to be a productive and reliable worker.

20. On March 9, 2005, Mr. White called Mr. Dunklin into his office and said that somebody had complained about him.  Mr. Dunklin asked who had complained and why.  Mr. White said not to worry.  "You are a good worker, and I never had any complaints about you

before."

21. Mr. Dunklin then asked Lisa Hill, a long time employee in the sanding and painting department, if she knew.  She told him, in a harsh tone of voice, to ask Thad X and Jeremy Sizemore, who had both been working directly with Mr. Dunklin that morning.

22. Thad X had no idea anything was wrong.  However, Mr. Sizemore admitted that he had complained to Mr. White because Mr. Dunklin had been missing some needle spots, while sanding.

23. Mr. Sizemore then apologized for having taken his complaint to their supervisor first, instead of just telling Mr. Dunklin directly.  That seemed to settle the matter, and Mr. Sizemore and Mr. Dunklin went to lunch together.

24. When Mr. Dunklin came back from lunch, however, Ms. Hill began picking on him. For example, in front of his co-workers, she yelled at him to hurry up and get the shop vacuum out of the house, now that he had finished sanding.

25. Mr. Dunklin was embarrassed by the way she spoke to him.  He said: "Ok, I'll go and get it.  Calm down."

26. But she continued talking to him in a hostile and scornful manner.

27. Mr. Dunklin eventually told Ms. Hill: "You're not my boss," and suggested that they go upstairs and talk to their supervisor, Mr. White.

28. In Mr. White's office, Ms. Hill continued to yell at Mr. Dunklin, calling him "lazy" among other things and saying that he "mopes around."  She then told Mr. White (apparently in reference to the shop vac): "If he does not like the way I do things, he can just quit and go home." She repeatedly pointed her finger at the door, motioning Mr. Dunklin to get out.

29. Mr. White did not contradict Ms. Hill, or try to soothe her anger.  He just let her rant.

After she was done, he told the two of them to go back downstairs and get their jobs done.

30. A short while later, Mr. White came downstairs to personally reassure Mr. Dunklin that he was doing a good job.   He told Mr. Dunklin not to worry because: "I'm your boss, not her."

31. However, Ms. Hill continued to harass Mr. Dunklin and embarrass him in front of his co-workers.

32. Mr. Dunklin believes, from the type of language that she used, that she was motivated to harass him in large part because of her negative racial stereotyping of him as a black worker.

33. The next day, Mr. Dunklin went back to Mr. White's office to complain about Ms. Hill's hostile attitude towards him, which was creating a hostile environment in the painting department, primarily based upon his race.

34. However, Mr. White had gone on vacation, and left Dave Cotton in charge.

35. Mr. Dunklin explained what had happened, and asked Mr. Cotton to talk to Ms. Hill.

36. After that, the company apparently decided to take Ms. Hill's side on this matter. Several members of management began a campaign to ostracize Mr. Dunklin and to tell lies about him in order to justify their actions.

37. The next day, Mr. Dunklin was suspended from working in the plant, and told not to approach within 50 feet of Ms. Hill.

38. The day after that, the president of the company, John Murphy, called Mr. Dunklin into his office.  He explained the company's action by telling Mr. Dunklin that someone had reported that he had a knife and that he had threatened to cut Lisa Hill's throat with it.

39. The charges about the knife and the threat were completely unfounded.  Mr. Dunklin does not own any kind of dangerous knife, he never brings one to work, and he was not using a

company knife at the time, as part of his work with the painting department.

40. Moreover, he did not threaten Ms. Hill with violence of any kind.

41. When Mr. Murphy did not take Mr. Dunklin's word that the charges were unfounded, Mr. Dunklin asked Mr. Murphy to produce his accuser, so he could defend himself from the charge.

42. Mr. Murphy declined to name the accuser, refused to conduct an investigation, and refused to grant Mr. Dunklin a hearing in which to defend himself.

43. According to Mr. Dunklin's information and belief, no one from work told Mr. Murphy that Mr. Dunklin had a knife, much less that he threatened to cut Ms. Hill's throat.

44. Not long after this discussion, Mr. Dunklin approached Mr. Murphy and asked to be allowed to go back to work in the plant again, since there was no evidence that he had done anything wrong.

45. Mr. Murphy indicated that it was not his (Murphy's) decision to make. He suggested that Mr. Dunklin talk to the supervisor of the paint department, Mr. White.

46. Mr. Dunklin tried to talk to Mr. White about the incident on three separate occasions during the ensuing couple of months. Each time, Mr. White said he did not want to talk about it.

47. More than a year later, in July, 2006, Mr. Dunklin met with his supervisor, Jeremy Wildermuth, and Contempri's owner, John Perry, and specifically asked when the suspension would be lifted, so he could go back to work inside the plant. He again said that he had never had a knife, nor made any threat to cut Ms. Hill.

48. Mr. Wildermuth and Mr. Perry told Mr. Dunklin that they had known all along that the knife charge was untrue, but that they felt that they had to protect Ms. Hill anyway. They refused to lift the suspension, on the grounds that they were still protecting Ms. Hill.

49. Mr. Dunklin then pointed out to Mr. Wildermuth and Mr. Perry that they had done nothing to protect him, when Mr. Powell had tried to beat him up, for allegedly not changing a tire properly; yet they were protecting Ms. Hill, even though they knew the charge was untrue.

50. Mr. Wildermuth and Mr. Perry offered no rational defense for their double standard. Nevertheless, they refused to reinstate Mr. Dunklin at that time.  As a result, Mr. Dunklin continues to be suspended from working in the plant to this day.

51. There are three basic work areas, where Mr. Dunklin could have been employed at Contempri Homes – (a) in the plant (for example, painting, sanding and plastering as Mr. Dunklin used to do), (b) on set-up (*i.e.* setting-up the homes on site), or (c) in the yard (*i.e.* outside the plant, doing such work as picking up trash, cutting down weeds, securing (and unsecuring) the manufactured homes, and protecting the houses on the lot from the elements).

52. After Mr. Dunklin was banished from the plant, he did some work on set-up for a few months.  His main job was to work with Mr. Mathis, leveling the floors of the pre-fabricated homes, upon installation.

53. Mr. Dunklin was assigned to work in Salsbury Park (in St. Louis) for most of the summer of 2005, helping to install Contempri's houses on a large building site.  Mr. Dunklin leveled floors, assisted with framing the houses, and performed other miscellaneous jobs as directed.

54. One day in July, 2005, while working in Salsbury Park, and more specifically while Mr. Dunklin was helping Mr. Murphy's son-in-law, Mark Maxwell, bind some trailers together, Mr. Murphy approached Mr. Dunklin and said that he (Murphy) had another task he wanted Mr. Dunklin to do, when he finished helping Mr. Maxwell.

55. Mr. Murphy later claimed that he named the task at the time, but, if so, Mr. Dunklin

was not familiar with the name or the task.  He therefore assumed Mr. Murphy would explain

what he wanted done after Mr. Dunklin finished helping Mr. Maxwell.

56. Mr. Dunklin did report to Mr. Murphy as soon as he finished helping Mr. Maxwell.

But, instead of explaining what he wanted done next, Mr. Murphy responded by yelling at Mr.

Dunklin and cussing him out.  Mr. Murphy said: "Whenever I fuckin' tell you to do something,

you fuckin' do it!"

57. In retrospect, Mr. Dunklin recognizes that this might have been a misunderstanding

(if it was not a deliberate act of racial provocation by Mr. Murphy).   Mr. Murphy may have

thought he had given Mr. Dunklin a specific direction to do something.  But Mr. Dunklin thought

he had been given a direction to report to Mr. Murphy when he was finished, so Mr. Murphy

could tell him what he wanted done next.

58. Even so, Mr. Murphy's means of expression was inappropriate.

59. Consequently, Mr. Dunklin told Mr. Murphy not to cuss him out.

60. Mr. Murphy responded: "Don't give me that fucking bullshit.  Don't play fuckin'

dumb."  Then, without further discussion, he kicked Mr. Dunklin off the site.

61. After that, Mr. Murphy let Mr. Dunklin know that he was suspended from working on

set-up, indefinitely.  This suspension, too, has yet to be lifted.

62. The only tasks that remained available to Mr. Dunklin within the company were yard

work and (occasional) flagging.

63. The yard is the worst of the three types of work described in ¶ 51 above for the

following reasons:

        a. One is exposed to the weather all year round.

        b. The work is the most monotonous of the three types of jobs.

c. The work is the most physically demanding of the three types of jobs, and most likely to cause injury, such as back and shoulder injuries due to the strenuous and highly repetitive motions.

d. There is generally not enough work in the yard to keep Mr. Dunklin busy for 40 hours per week, so he generally gets only 30-35 hours of work per week.

e. Yard workers are the lowest paid per hour of any workers at Contempri Homes.  Their wages are capped at $11 per hour.

64. By contrast, Mr. Mathis, who was hired at the same time and at the same pay as Mr. Dunklin, continues to work primarily in setting up houses.

65. Mr. Mathis now makes $14 per hour, while Mr. Dunklin makes only $11.  Mr. Mathis is also employed 40 hours per week, while Mr. Dunklin only gets 30-35 hours work per week.

66. Mr. Dunklin at first hoped to make up for some of his low pay and short hours, not just by flagging, but by making *medium* and *long-haul* excursions as a flagger.

67. By *short-haul* delivery, Mr. Dunklin means a delivery trip that can be completed in an eight hour period.  By *medium-haul*, Mr. Dunklin means a delivery trip that requires more than eight hours, but which can be completed in less than twenty-four hours.  By *long-haul*, Mr. Dunklin means a delivery trip that requires the drivers to stay overnight along the way.

68. A short-haul trip requires no overtime pay, a medium-haul trip requires some overtime pay (at time-and-a-half), and a long-haul trip requires substantially more overtime pay.

69. Most of Contempri's business requires either short-haul or medium-haul deliveries. However, Contempri occasionally makes long-haul deliveries.

70. Jeremy Wildermuth is Mr. Dunklin's supervisor with respect to his job as a flagger. As such, it is Mr. Widermuth's duty to ensure that a flagger is assigned to each truck driver who is delivering one of Contempri's prefabricated homes.

71. By summer of 2005, Mr. Dunklin was the most experienced flagger for Contempri. He was also considered by Mr. Wildermuth, and other company officials, to be the head flagger for Contempri.

72. Mr. Dunklin repeatedly asked Mr. Wildermuth to assign him to the long-distance flagging trips.  However, Mr. Wildermuth always assigned less experienced white employees.

73. When Mr. Dunklin complained to Mr. Wildermuth, he said that Mr. Murphy had told him not to assign Mr. Dunklin to the long-distance trips.

74. But when Mr. Dunklin asked Mr. Murphy about it, Mr. Murphy said that it was up to Mr. Wildermuth to make these assignments.

75. In any event, Mr. Wildermuth assigned temporary workers, or workers from the set crew, with little or no flagging experience, to do the long haul flagging, rather than Mr. Dunklin.

76. Even for short-haul flagging, Mr. Dunklin had difficulty obtaining assignments, because he is black.

77. Contempri has only three semi-drivers – Tom Presswood, Rick Powell, and Donnie Keene – who do all the driving, whether for short-haul, medium-haul, or long-haul.

78. Of these three drivers, Mr. Presswood is blatantly prejudiced.  He flatly refuses to let Mr. Dunklin flag for him, because Mr. Dunklin is black.

79. Some time in July or August, 2005, Mr. Presswood told Mr. Dunklin that he did not want him (Dunklin) to escort him (Presswood) anywhere.  He said he only wanted to use Dave Thompson as his flagger.

80. Mr. Dunklin complained to Mr. Wildermuth and Contempri's owner, John Perry.  He told them that Mr. Presswood was refusing to allow him (Dunklin) to flag for him (Presswood), merely because he (Dunklin) is black.  Mr. Dunklin pointed out that that is unlawful.

81. However, Mr. Wildermuth and Mr. Perry refused to take action, or exercise control.

82. At the time, Mr. Presswood said he only wanted one flagger to flag for him, and his flagger-of-choice was Mr. Thompson.

83. However, Mr. Thompson was merely a temporary worker at the time.

84. Furthermore, Mr. Dunklin was a much more experienced flagger than Mr. Thompson. In fact, Mr. Dunklin had been the one to train Mr. Thompson at flagging.

85. In addition, it was not true that Mr. Presswood *only* wanted Mr. Thompson as his flagger.

86. Mr. Presswood *only* wanted *white* employees to serve as his flagger.

87. A second driver, Mr. Keene, also made it clear that he generally prefers not to have Mr. Dunklin as his flagger, because Mr. Dunklin is black.

88. In or about summer, 2004, there was an incident between Mr. Dunklin and Mr. Keene, in which Mr. Keene cursed at Mr. Dunklin and used racial epithets.  Mr. Dunklin complained about this to management.  Mr. Keene admitted that he had done these things.

89. Mr. Dunklin does not know whether Mr. Keene was reprimanded, warned, or disciplined in any way.

90. However, he and Mr. Dunklin have had an uneasy peace ever since.  Mr. Keene will tolerate Mr. Dunklin as his flagger, though he still prefers to use other white flaggers when available.

91. In addition, Mr. Keene is only a part-time driver, and does not haul nearly as many homes for the company as Mr. Presswood and Mr. Powell.

92. Prior to February, 2006, the third driver, Mr. Powell, used Mr. Dunklin as his flagger on occasion, also.

93. However, when he did so, he expected Mr. Dunklin to act as his servant, because he is black.  For example, he would tell Mr. Dunklin to go get him coffee, or to buy him cigarettes. But Mr. Powell would never do the same for Mr. Dunklin.

94. More importantly, Mr. Powell had an ongoing history of racially-motivated incidents with Mr. Dunklin.

95. The first such incident occurred in April or May, 2005.  Mr. Dunklin was working with Sean Riechman in the yard changing a tire on one of the big trailers.

96. Mr. Dunklin and Mr. Riechman were working together, using a zip gun to take the lug wrenches off.

97. Mr. Powell came over and tried to tell them that they were not using the zip gun properly.

98. Mr. Powell had no authority, supervisory or otherwise, over this task.

99. Nevertheless, when Mr. Dunklin and Mr. Riechman did not promptly follow Mr. Powell's instructions, Mr. Powell became angry.  He directed his anger at Mr. Dunklin, saying to him: "Why don't you get your fuckin' head out of your ass?"

100. This was not the first time Mr. Powell had cussed at Mr. Dunklin.

101. Mr. Dunklin said: "Man, I'm tired of you cussing me."

102. Mr. Powell said: "Mother fucker, I'll show you what I'm going to do."

103. Then he charged at Mr. Dunklin with both fists balled up.

104. Mr. Dunklin was sure Mr. Powell was about to hit him.

105. Their supervisor, Mr. Wildermuth, thought so, too.  He immediately stepped in to stop Mr. Powell from hitting Mr. Dunklin.

106. However, Mr. Wildermuth did not report Mr. Powell's assault against Mr. Dunklin

to any higher authority at the plant.

107. Nor did Mr. Wildermuth himself take any disciplinary action against Mr. Powell.

108. This emboldened Mr. Powell to continue to be abusive towards Mr. Dunklin.

109. The next serious incident occurred in the last week of October or first week of November, 2005.  Mr. Dunklin was flagging for Mr. Powell as they entered onto Interstate 64.

110. The proper procedure for a flagger, as they enter onto an interstate highway, is for the flagger to lead the truck onto the entrance ramp.  Then, as soon as they merge onto the highway, the driver of the semi is supposed to move around the flagger and take the lead.

111. Accordingly, Mr. Dunklin led Mr. Powell up the entrance ramp.  He then pulled his flag truck to the far right side of the highway, so Mr. Powell could pass more easily, and he could fall in behind Mr. Powell.

112. After Mr. Dunklin pulled to the far right and slowed down, he noticed that instead of going around him, Mr. Powell was driving his truck straight at Mr. Dunklin's flag truck.

113. Mr. Dunklin believed that Mr. Powell was about to run over him, and he was afraid.

114. To avoid being run over, he had to drive his flag truck into the ditch on the side of the road.  Even so, Mr. Dunklin was almost hit by the house as Mr. Powell drove past.

115. Afterward, Mr. Powell refused to give Mr. Dunklin any explanation for his behavior.

116. Mr. Dunklin then called Mr. Wildermuth to complain.

117. But again, no disciplinary action was taken against Mr. Powell.

118. The next incident occurred around on or around February 15, 2006.

119. Mr. Dunklin was again flagging for Mr. Powell that day, and assisting him in delivering a prefabricated house to a site in St. Louis.

120. Several employees from Contempri Homes were also present, including Dave

Thompson, Brandon Fisher, Bobby Jo Fisher, and Donnie Keene.

121. In addition, a contractor from St. Louis was present, with about seven of his employees.

122. Mr. Powell was trying to back his truck up into the spot where he was going to set the house down.

123. The other men from Contempri Homes, including Mr. Dunklin were standing near Mr. Powell's semi as he maneuvered forward and back.

124. Mr. Dunklin's flag truck was face up to Mr. Powell's semi and fairly close to it.

125. At some point, Mr. Powell felt it was in the way, and began yelling at Mr. Dunklin: "Move the Truck!"

126. Mr. Dunklin tried to comply.  He had been standing on the driver's side of Mr. Powell's truck.  Therefore, he attempted to cut between the two trucks (which still faced each other) and circle over to the driver's side of his truck.

127. As soon as Mr. Dunklin stepped in front of Mr. Powell's semi, however, Mr. Powell stepped on the gas going forward and appeared to try to hit Mr. Dunklin.

128. Mr. Dunklin jumped backed.

129. Mr. Powell continued to yell at him to move the truck.

130. So Mr. Dunklin tried again to cross in front of the semi, and Mr. Powell again accelerated, as if he intended to hit Mr. Dunklin, forcing Mr. Dunklin to jump back.

131. This happened three times.

132. Mr. Dunklin then decided to climb into his flag truck from the passenger's side, so as not to risk having Mr. Powell try to run him over again.

133. But no sooner had Mr. Dunklin climbed into the passenger side of the flag truck than

Mr. Powell drove his truck forward and rammed Mr. Dunklin's truck, and began to push it backwards.

134. Mr. Dunklin felt helpless and terrified, as Mr. Powell continued to push the flag truck backwards for about 12 feet.

135. When Mr. Powell finally stopped, Mr. Dunklin leapt out of the flag truck.

136. Mr.  Dunklin then called Mr. Wildermuth to complain about Mr. Dunklin's actions.

137. According to Mr. Dunklin's information and belief, at least one of his co-workers also called Mr. Wildermuth to complain about Mr. Powell's actions.

138. According to Mr. Dunklin's further information and belief, the contractor from St. Louis also called Contempri Homes to complain about Mr. Powell's actions, and to say that they did not want Mr. Powell delivering any more houses to them.

139. Nevertheless, Contempri took no disciplinary action against Mr. Powell.

140. As a result of these incidents, Mr. Dunklin will not flag for Mr. Powell anymore, but this is by his own choice, and not by any action by Contempri.

141. That leaves Mr. Keene as the only driver for whom Mr. Dunklin can flag on occasion.

142. Aside from these attacks by Mr. Powell, Mr. Dunklin has also been subjected to a number of more mundane acts of prejudice in the workplace on a regular and ongoing basis.

143. For example, a couple of workers from set, Dave Brand and Terry Sullivan regularly refer to him as "boy" even though Mr. Dunklin is over 40 years old.

144. Mr. Brand and Mr. Sullivan do not address their white colleagues as "boy".

145. The plant's maintenance worker, Bobby Jo Fisher, frequently used the word "nigger" in front of Mr. Dunklin.

146. Most of Mr. Fisher's references to "nigger" were not aimed directly at denigrating Mr. Dunklin.  Mr. Fisher generally used "nigger" in the context of "nigger-rigging", *i.e.* making a make-shift repair with whatever materials happen to be on hand.

147. However, Mr. Fisher knew the significance of the word when he used it.  This is demonstrated by the fact that he would frequently direct an additional remark at Mr. Dunklin, to the effect of: "This is how your people do it."  He liked to laugh about it.

148. Mr. Fisher also knew that the word was offensive to Mr. Dunklin.  He never said "nigger" or used the phrase "nigger-rigging" when he was alone with Mr. Dunklin.  He only used the phrase when there were a number of white co-workers around to back him up and join in the teasing, which Mr. Dunklin found to be offensive.

149. In fact, Mr. Dunklin became so fed up one day that he tried to speak to Mr. Fisher about it.  He said to Mr. Fisher something like: "Hey Man, I got kids.  Is that the way you think of my kids, as niggers?"

150. However, Mr. Fisher just talked right over Mr. Dunklin and kept laughing about it with his white co-workers.

151. In addition, Mr. Dunklin found it disturbing that, on several occasions, Mr. Fisher made these comments, and used the word "nigger", in front of Mr. Murphy, the company president.  Mr. Murphy would generally laugh with Mr. Fisher.  He never said anything to Mr. Fisher about this language being inappropriate or disrespectful to Mr. Dunklin.

152. Contempri Homes has no formal policy for handling this type of complaint about racial harassment or discrimination.  Or, if they do, Mr. Dunklin was not informed about the policy.

153. There is no company agent responsible for hearing such complaints.

154. Near the end of July or early August, 2005, Mr. Dunklin began suggesting to Mr. Wildermuth, who supervises the flaggers, that they needed to have a meeting with company officials to discuss the various acts of racial hostility against him.

155. Mr. Wildermuth kept putting Mr. Dunklin off, saying that Mr. Murphy was too busy to meet.

156. However, on or about October 25th, Mr. Dunklin spoke to Mr. Murphy's nephew about wanting to have a meeting to discuss racially motivated incidents on the job.

157. A meeting was scheduled the next day to discuss the problem.

158. The meeting was attended by Mr. Perry (the company's owner), Bobby Joe Fisher, Mr. Murphy (the company's president), Mr. Wildermuth (the supervisor), and Mr. Dunklin.

159. At the meeting, Mr. Dunklin said he was tired of being referred to as "nigger" and "boy" on the job.

160. Mr. Fisher apologized, but said he did not mean his remarks to be offensive.

161. Mr. Murphy acknowledged that comments of this type have been made more than once, and promised that the company will do everything they can to stop them from recurring.

162. Mr. Dunklin then asked Mr. Murphy and Mr. Wildermuth, why he was not allowed to flag on any of the long-haul trips that would enable him to earn substantial overtime.  He cited two recent trips as examples, one to South Carolina and one to Iowa.

163, Mr. Murphy said he did not remember why Mr. Dunklin was not assigned.  Mr. Wildermuth then said that it had been Mr. Murphy's decision.  But Mr. Murphy denied that he had told Mr. Wildermuth not to send Mr. Dunklin.

164. Mr. Wildermuth then pointed out that the company had two flaggers, and he had to pick one.

165. According to Mr. Wildermuth, there was no real reason, he just happened to pick the other driver, Mr. Riechman (and then later Mr. Thompson after Mr. Riechman left) to make these long-haul trips.

166. Mr. Wildermuth also pointed out that Mr. Riechman had two children and needed the extra money.

167. Mr. Murphy then pointed out that there had been a prior long-haul trip, in which Mr. Dunklin had said that he did not want to stay out-of-town overnight.

168. Mr. Dunklin responded by pointing out that he is the head flagger, and should be given first opportunity to make these trips. He said that he believed it was discriminatory on the company's part, to favor a white man with less seniority and experience than he.

169. Mr. Murphy next discussed the incident at Salsbury Park, when he yelled at Mr. Dunklin. He said he yelled at Mr. Dunklin because he had not performed the task that he had been asked to do.

170. However, Mr. Murphy made no attempt to explain why this single incident led him to suspend Mr. Dunklin from working on set-up ever since, or why Mr. Dunklin could not be reinstated.

171. Mr. Dunklin next raised a complaint that the set-up crew does things that upset him and that show him disrespect. For example, someone nailed his oversized vehicle sign onto his truck backwards, just before Mr. Dunklin was going to be driving. Another time, Mr. Dunklin found broken beer bottles in the bed of his truck.

172, Mr. Dunklin indicated that the set-up crew never did these things to other flaggers, and they only picked on him because he is black.

173. Mr. Perry labeled these incidents "practical jokes" and agreed with Mr. Dunklin that

such practical jokes can be a problem.

174. He further agreed to hold a subsequent meeting with the employees to address this problem.

175. However, this subsequent meeting with employees was never held.

176. Mr. Dunklin also brought up the issue of his suspension from the plant, and the incident with Ms. Hill.

177. However, Mr. Perry declined to talk about this incident at that time.  He told Mr. Dunklin that they would schedule another meeting to talk about the Lisa Hill incident.

178. This meeting never took place, either.

179. In sum, Mr. Perry and Mr. Murphy did not make a serious attempt to address the racial discrimination implicit in each of the following issues:

> a) Mr. Dunklin was suspended from the plant based on a charge that Mr. Murphy had apparently made up and which management knew to be false – namely that Mr. Dunklin had threatened to cut Ms. Hill's throat with a knife.
>
> b) Mr. Dunklin had been suspended from working on set-up, based upon an incident so minor that no white employee would have received such a ban under the same circumstances.
>
> c) Mr. Dunklin was paid much less than white workers, and given the worst possible job at the company, ostensibly as a disciplinary measure, but actually just because he is black.
>
> d) Mr. Dunklin had been assaulted by Mr. Powell and placed in imminent danger of bodily harm, but no action was taken by the company to discipline Mr. Powell, because he is a white man and the person he was assaulting (Mr. Dunklin) is black.

180. Furthermore, while recognizing the problem that Mr. Dunklin was never selected for long-haul flagging, Contempri took no action to correct the problem.

181. Mr. Dunklin still is never selected for long-haul flagging.  He also still is restricted

to working only in the yard, not inside the plant or on set-up, even though no plausible explanation was given for suspending him in the first place, much less continuing to suspend him from these work areas.

182. Overall, Mr. Dunklin did not receive a fair or even meaningful hearing, because the company was unwilling to address the underlying issues of racial bias at Contempri.

183. Some time in the week after this meeting to address Mr. Dunklin's concerns about racism, the second major incident with Mr. Powell occurred.  (See ¶¶ 109-117 above.).

184. After that incident, and in light of all the previous incidents of discrimination at Contempri Homes, and in light of the fact that Contempri still would do nothing to protect him, Mr. Dunklin had what amounts to a nervous breakdown.

185. Indeed, Mr. Dunklin went to the emergency room at Carbondale Hospital on November 2nd, 2005.   He told the doctor, Paul Wienhold, a psychiatrist, that the words nigger and low-down nigger just kept ringing in his head.  He said he felt worthless because of the way they talked about him at work.

186. He also told the doctor he was having deep pains in his chest, which the doctor thought were anxiety attacks.

187. The psychiatrist, in turn, recommended that he see a psychological counselor on an ongoing basis.  Mr. Dunklin has been seeing Ms. Molly McElvain ever since.

188. He also began taking medication for his nerves.

189. In addition to his mental injuries, Mr. Dunklin suffered a serious physical injury to his shoulder in September, 2006, while working in the yard.

190. Much of Mr. Dunklin's work in the yard involves jacking-up the houses.  This is done by hand and the houses are quite heavy.

191. Mr. Dunklin's shoulder began to hurt chronically from excessive cranking.

192. One day, when he was throwing shingles out of a truck, he felt a ripping pain shoot through his shoulder.

193. Dunklin went to the Emergency Room at Carbondale Hospital.  The Emergency Room doctor referred him to Southern Illinois Orthopedics.  The orthopedics doctor then referred him to physical therapy.

194. Mr. Dunklin has been receiving physical therapy since the middle of October, 2006.

**COUNT I**
**Racial Discrimination by Contempri Homes Under Title VII**

195. The Plaintiff repeats and realleges the factual allegations of paragraphs 5-194, as if more fully set forth herein.

196. 42 USC § 2000e-2 provides:

> It shall be an unlawful employment practice for an employer–
> (1) . . .to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities because of such individual's race, color, religion, sex, or national origin.

197. Contempri is an employer, duly covered by the provisions of 42 USC § 2000e-2.

198. Mr. Dunklin began working for Contempri as a temporary worker, hired through a temporary agency in January, 2004.

199. Some time in March or April, 2004, Mr. Dunklin was hired directly by Contempri.

200. At that time, and over the course of the next year, he was asked to do several different jobs, including flagging.  However, on average, he was assigned to spend more than half

of his time working in the painting department inside the plant.

201. This job required Mr. Dunklin to do some sanding, some painting, and some dry wall.

202. Mr. Dunklin is a member of a protected class, being African-American by race and black by color.

203. He has performed his various job duties for Contempri satisfactorily, and has met his employer's legitimate expectations in all significant respects.

204. He is qualified to work in the paint department, or on setting up the houses.  In fact, he has already done both of these jobs for Contempri and was meeting his employer's legitimate expectations in both of these jobs before he was suspended from them.

205. One could say that Mr. Dunklin suffered four distinct adverse employment actions while working at Contempri:

> (1) He was suspended from working in the plant as a result of a minor argument with Ms. Hill about not removing a shop vac from one of the homes.  This suspension constituted a form of disciplinary action by Contempri against Mr. Dunklin.

> (2) (a) The company president, John Murphy, made up a false story (or else promulgated a malicious story he knew to be unfounded) that Mr. Dunklin had threatened to cut Ms. Hill's throat with a knife.  (b) The company, including its owner, knew Mr. Murphy's story to be false, but acted as if it was true anyway, out of a perceived need "to protect Ms. Hill."  (c) As a result, the company extended Mr. Dunklin's suspension from the plant for nearly two years.

> (3) Mr. Dunklin was suspended indefinitely from working on setting-up houses as a result of a minor miscommunication between him and Mr. Murphy.  This suspension constituted a form of disciplinary action by Contempri against Mr. Dunklin.

> (4) Even though Mr. Dunklin is considered the head flagger at Contempri, he has never been offered the opportunity to make the

most lucrative long-haul trips as a flagger, and in fact has been passed over on several occasions by Mr. Wildermuth when he explicitly asked for the long-haul assignment.

206. Alternatively, one could characterize the first three adverse employment actions above as a single act of *demotion* by management.  Taken together, the acts of discipline (labeled (1) through (3) above) have foreclosed all opportunities for Mr. Dunklin to work at Contempri except in the yard, which is the least desirable and most poorly paid of all positions at Contempri. The notion that Mr. Dunklin's suspensions were disciplinary in nature – caused by: (a) an argument with Ms. Hill over a shop vac; (b) a phony accusation that he threatened to cut Ms. Hill's throat; and (c) a minor argument with Mr. Murphy that resulted from a miscommunication – has turned out to be a pretext.

207. There is significant evidence, both direct and circumstantial, that Contempri would not have inflicted the adverse employment actions listed above, and confined Mr. Dunklin to the most menial and poorly paid work in the yard, but for the fact that he is black.

208. The circumstantial evidence includes but is not limited to:

1. Mr. Mathis was hired at the same time as Mr. Dunklin, through the same temporary jobs company, and started in a comparable job at the same pay and with a comparable opportunity for advancement.  Their pay remained identical, until Mr. Dunklin was "demoted."   Mr. Mathis is now making $14 per hour, working on set-up, while Mr. Dunklin is only making $11 per hour, working in the yard.  Moreover, Mr. Mathis's wage can still increase, but Mr. Dunklin's cannot.

2. The first extended disciplinary suspension was based on the allegation that Mr. Dunklin (a black man) threatened to harm a (white) co-worker Ms. Hill, even though no evidence was ever presented to support this charge.  By contrast, Mr. Powell (a white man) not only *threatened* to harm Mr. Dunklin in one instance, but he eventually carried out that threat in a later instance.  However, no comparable disciplinary action was imposed on Mr. Powell.

3. The second extended disciplinary suspension was based on an apparent miscommunication and misunderstanding. White workers have made minor mistakes, or had minor misunderstandings with their supervisors while working on set-up for Contempri, on a number of occasions, but no comparable disciplinary action has ever been imposed on white workers.

4. Mr. Wildermuth passed over Mr. Dunklin for the lucrative position of flagging for overnight long-haul trips, in favor of less experienced *white* flaggers, despite the fact that Mr. Dunklin repeatedly asked to be permitted to make these trips.

209. In addition, there is direct evidence that some or all of the adverse employment decisions described in ¶ 205 above were motivated in substantial part by Mr. Dunklin's race.

210. Just a day or two after Mr. Dunklin was suspended from working in the plant, the company president, Mr. Murphy, made up a story about Mr. Dunklin, namely that he had threatened Ms. Hill with a knife. Mr. Murphy did so, in order to justify the harshness of the disciplinary action, which he knew could otherwise only be attributed to racial bias.

211. The story that Mr. Murphy made up relies on traditional racist stereotypes and fears about black men savaging white women.

212. Furthermore, Contempri's owner, John Perry, and Mr. Wildermuth have admitted that the company knew all along that Mr. Murphy's story was false, although Mr. Dunklin himself did not discover that the company knew the story was false until July, 2006.

213. This shows bad faith on the part of Contempri in that it acted on the story as if it were true, when it knew the story was false.

214. Given that Contempri knew Mr. Dunklin had not actually threatened Ms. Hill, the only thing that Contempri was protecting Ms. Hill from is having to work with a black man. This kind of "protection" is racist and unlawful.

215. Contempri also knew or should have known that Ms. Hill's criticism of Mr.

Dunklin, which triggered the suspension, was unjustified and primarily racially motivated.

216. In addition, Contempri knew that Ms. Hill was not Mr. Dunklin's supervisor and had no authority to criticize or evaluate Mr. Dunklin's work.  Contempri also knew that the relevant supervisor, Mr. White, believed at the time that Mr. Dunklin was doing a good job.

217. Mr. Dunklin therefore infers and believes that Contempri made a conscious choice to support Ms. Hill's racially motivated criticisms of Mr. Dunklin, in part because Contempri, or some of its managers, actively condones her racial bias against Mr. Dunklin.

218. Contempri did not think twice about disciplining Mr. Dunklin, and kicking him out of the plant, based upon an allegation it knew to be false, because, at bottom, Contempri (or some of its key managers) believed a black man's place in the company should be limited to working in the yard, anyway.

219. During the first few months after being suspended from the plant, Mr. Dunklin spent some time working in the yard, which was the least desirable work available to him at Contempri, but he also spent substantial time working on the preferable job of "set-up."

221. In July, 2005, Mr. Murphy either deliberately provoked an argument with Mr. Dunklin (by making another false accusation) or else they had a simple miscommunication.

222. Mr. Dunklin thought he was supposed to report to Mr. Murphy for his next task.  Mr. Murphy claimed that he had already told Mr. Dunklin what his next task was to be.

223. Therefore, when Mr. Dunklin did report to Mr. Murphy, as he thought he had been instructed to do, Mr. Murphy began yelling at him because he had not gone immediately to perform the next assigned task.

224. Mr. Murphy yelled and cursed at Mr. Dunklin in front of other workers.  He also did not give Mr. Dunklin a chance to explain.

225. Mr. Dunklin, in turn, did not understand why he was being yelled at, and told Mr. Murphy not to cuss at him.

226. At that point, and again as a kind of disciplinary action, Mr. Murphy exiled Mr. Dunklin from the job site.

227. Without any further discussion, the suspension by Mr. Murphy was then extended to include all other set-up jobs.  It remains in effect to this day.

228. As a result, Mr. Dunklin has not been able to obtain work setting up houses for Contempri ever since.

229. Prior to this incident, Mr. Dunklin had worked on setting up houses and leveling floors (alongside Mr. Mathis), and his work had been considered satisfactory by his supervisors.

230. Mr. Murphy's decision to suspend Mr. Dunklin, because of such a minor incident, and then to continue to deny him the opportunity to work on setting up houses for more than a year-and-a-half thereafter, is so far out of proportion with the supposed offense, that Mr. Dunklin infers and believes that Mr. Murphy and other Contempri officials must have had an ulterior motive in this suspension as well.

231. Specifically, Mr. Dunklin infers and believes that either: (a) Mr. Murphy cynically staged the argument as a pretext for kicking Mr. Dunklin out of set-up; or (b) Mr. Murphy deliberately blew up a minor misunderstanding with Mr. Dunklin into a pretext for imposing an indefinite suspension from set-up.  Either way, the only conceivable motive is that Mr. Murphy wanted to limit Mr. Dunklin to what he (Murphy) believed was his (Dunklin's) proper place as a black man, being employment in the yard as a maintenance worker.

232. Neither Mr. Murphy, nor any of the supervisors at Contempri, have ever inflicted a comparable disciplinary measure against a white worker for such a minor incident.

233. Once the second suspension was put into effect, Mr. Dunklin's opportunity for work at Contempri was limited to working in the yard or flagging.

234. The maximum pay for working in the yard or flagging is $11 per hour.  The pay for work in the plant, for a white worker with Mr. Dunklin's years of experience with Contempri would have been $14 or $15 per hour.

235. Although Mr. Dunklin perceived his two "suspensions" to be unfair, Mr. Dunklin did not realize at first that these suspensions would go on for a year or more.  Therefore, he also did not realize at first that, even though he did not immediately suffer a loss in pay, he would eventually be prevented from getting the pay raises that other workers such as Mr. Mathis got.

236. As he gradually came to realize these facts, Mr. Dunklin complained about his "suspensions", and asked to be reinstated on several occasions and/or to be given overtime work as a flagger to make up for some of the lost wages.

237. His most recent formal request for reinstatement to a position inside the plant occurred in July, 2006, when he arranged for a meeting with his supervisor, Mr. Wildermuth, and Contempri's owner, Mr. Perry.

238. Mr. Dunklin pointed out at that meeting that he would like to have the same wages and the same opportunities for advancement as white workers with similar seniority.

239. Mr. Perry and Mr. Wildermuth responded by admitting that they had had no basis for suspending him from working inside the plant, in the first place, since they knew at the time that the story about threatening Ms. Hill was untrue.

240. Nevertheless, they did not agree to reinstate Mr. Dunklin.  Nor did they suggest a date when his suspension should end.

241. It was at that point that Mr. Dunklin finally realized that he had not only been

wrongly "suspended" by Contempri, but that he had also been suspended by Contempri in bad

faith, as a pretext for giving him a permanent (*de facto*) demotion to working in the yard.

242. In addition, this was the first time Mr. Dunklin realized that Mr. Murphy had

*deliberately lied* when he said that Mr. Dunklin had threatened to cut Ms. Hill with a knife;

whence, it became clear that Mr. Murphy's motive was not to protect Ms. Hill, but simply to

express his own (and/or Contempri's) racial prejudice towards Mr. Dunklin by: (a) humiliating

him; and (b) limiting him to the most menial and lowest paying job in the company.

243. Given that Mr. Dunklin was confined to the yard, and his salary capped at $11 per

hour, his best remaining opportunity for him to make extra money was via flagging.

244. Contempri is often requested to deliver manufactured homes a long enough distance

that the driver (and flagger) cannot complete the trip in an eight-hour day.

245. Most of these longer distance trips are "medium-haul", in the sense that the drive

can be made in one extended day.  In these cases, a flagger might receive a few hours of overtime

pay at time-and-a-half.

246. However, Contempri makes occasional deliveries that require "long-haul" trips in

the sense that an overnight stay is required.  In these instances, a flagger might receive a

substantial number of overtime hours.

247. Mr. Dunklin's supervisor for flagging was Jeremy Wildermuth.

248. Mr. Wildermuth considered Mr. Dunklin to be the head flagger for Contempri, and

he told Mr. Dunklin so.

249. By the beginning of summer 2005, Mr. Dunklin was also the most experienced

flagger for Contempri.

250. On several occasions, Mr. Dunklin has requested Mr. Wildermuth to assign him as

flagger for the long-haul trips.  This would have allowed him to earn the most overtime pay.

251 However, Mr. Wildermuth, either by his own choosing or at the direction of Mr. Murphy, has always chosen white workers to flag for the long-haul trips.

252. The net effect has been to establish a policy at Contempri that long-haul flagging, with its most generous overtime pay, is always offered to white workers first.

253. Each time the company assigns a white employee to perform the long-haul driving, rather than offer that opportunity to Mr. Dunklin, they are committing an act of discrimination.

254. Furthermore, even on short-  and medium-haul driving, Mr. Wildermuth may have had discretion to allow Mr. Presswood to choose his own flaggers for any *legal* reason, but not for an illegal reason.  Once it became apparent that Mr. Presswood's policy was to choose anyone but Mr. Dunklin, Mr. Wildermuth and Contempri had a duty to intervene and force Mr. Presswood to use Mr. Dunklin.  They discriminated against Mr. Dunklin by failing to do so.

255. Because of the acts of discrimination described above, Mr. Dunklin has been limited to working only 30 to 35 hours per week at Contempri and earning only $11/hour; whereas he should be working 40 hours per week and earning at least $14/hour, with more substantial opportunities for time-and-a-half overtime pay.

256. In addition, Mr. Dunklin has suffered a serious physical injury to his shoulder as a result of being unlawfully limited to working in the yard.

257. In addition, Mr. Dunklin has suffered severe mental anguish and distress from the various acts of racism.

258. Finally, the act by Contemrpi's president, Mr. Murphy, in making up a story, or else promulgating a story that he knew to be unfounded, that Mr. Dunklin had threatened to cut Ms. Hill's throat with a knife shows that management acted with malice and ill will in its acts of

discrimination against Mr. Dunklin.

**WHEREFORE**, the Plaintiff requests the following relief:

a) That he be awarded compensatory damages against Contempri in the amount of $200,000, together with the costs of these proceedings, including reasonable attorneys' fees;

b) That he be awarded back pay to compensate for the loss of work hours, the loss of overtime pay, the lower hourly pay rate that he received, and any loss of benefits, due to having been confined to working in the yard;

c) That Contempri restore him to a position inside the plant, and that he be granted seniority and paid at the rate that he would have been paid if he had not been suspended or demoted from working in the plant;

d) That Contempri rescind and remove from his employment file any record of his having been disciplined by Contempri for threatening Ms. Hill;

e) That he be awarded punitive damages in the amount of $500,000;

f) That he be awarded such other and further relief as his cause may require.

## Count II
## Racially Hostile Environment in Violation of Title VII

260. The Plaintiff repeats and realleges the factual allegations of paragraphs 5-194, as if more fully set forth herein.

261. 42 USC § 2000e-2 provides:

It shall be an unlawful employment practice for an employer–
(1) . . .to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities because of such individual's race, color, religion, sex, or national origin.

262. Contempri is an employer, duly covered by the provisions of 42 USC § 2000e-2.

263. Mr. Dunklin began work for Contempri as a temporary worker, hired through a temporary job agency in January, 2004.

264. Some time in March or April, 2004, Mr. Dunklin was hired directly by Contempri.

265. At that time, and over the course of the next year, he was asked to do several different jobs, including flagging. However, on average, he was assigned to spend more than half of his time working in the painting department inside the plant.

266. For much of the time that Mr. Dunklin worked at Contempri, he was the company's only non-temporary black employee.

267. From the start, Mr. Dunklin faced hostility and harassment from many of his co-workers. This hostility and harassment was due primarily to Mr. Dunklin's race.

268. The hostility and harassment was often aided and abetted, and sometimes even actively promoted by Mr. Dunklin's supervisors and the company president, Mr. Murphy.

269. In fact, Mr. Dunklin reported various acts of harassment to his supervisors, and Contempri officials even witnessed some of the acts of harassment, but his supervisors never did anything to try to remedy the problem.

270. This racial hostility substantially altered the "terms, conditions, and privileges" of Mr. Dunklin's employment at Contempri in a number of ways. It made him feel uncomfortable every day at work. It also led to his being disciplined for things that management knew he did not do, which ultimately resulted in his opportunities becoming limited to the lowest paid and most unpleasant job available at Contempri, namely working in the yard.

271. Additionally, the particular acts of harassment by Mr. Powell placed Mr. Dunklin in

imminent danger of severe physical harm or even death.

272. The constant stress (and fear) also caused Mr. Dunklin to have what amounted to a nervous breakdown.

273. For analytic purposes, the racial harassment that Mr. Dunklin experienced can be divided into four interrelated sub-groupings, each of which contributed to the overall hostile environment.

274. First, a number of Contempri's employees would refer to Mr. Dunklin as "boy". In addition, some of these employees would make frequent use of the word "nigger" both as a noun and as an adjective, as for example in the phrase "nigger-rigging."

275. Mr. Dunklin's co-workers seemed to know that these words and their implications were offensive to him. They would only use the words when they were in a group and when they could, in effect, gang up on him.

276. This kind of verbal harassment was pervasive, and unpleasant to Mr. Dunklin. Therefore, it made it more difficult for Mr. Dunklin to do his job at Contempri.

277. Mr. Dunklin complained on a number of occasions to management and asked for a meeting to discuss this type of harassment. Management finally scheduled a meeting with Mr. Dunklin on October 26, 2005.

278. At that meeting, the company owner, Mr. Perry talked about the need for the employees to respect each other more.

279. However, management had no viable policy to address racially harassing speech or actions by co-workers, nor did management promulgate a new policy to address the problem after Mr. Dunklin brought it to their attention.

280. Management also made no attempt to counsel any of its white employees or warn

them about inappropriate behavior or harassing use of language in the workplace.

281. Management also made no attempt to protect Mr. Dunklin, by keeping the worst offenders, such as Mr. Powell, away from him.

282. As a result, the hostile speech and hostile attitudes persisted and still persist to this day.

283. Second, one of Mr. Dunklin's main jobs was to work for Contempri as a flagger.  In fact, Mr. Dunklin had become established as the head flagger for Contempri.

284. However, all three of the company's drivers preferred *not* to use Mr. Dunklin as their flagger, merely because he is black.

285. In particular, one driver, Mr. Presswood, flatly refused to work with Mr. Dunklin because he is black.

286. Another driver, Mr. Powell, would allow Mr. Dunklin to flag for him, when he had to, but he treated Mr. Dunklin as an inferior and a servant.

287. The third driver, Mr. Keene, made a conscious (and conscientious) effort to control his racial animosity, after an initial racial confrontation with Mr. Dunklin,.  He, too, would allow Mr. Dunklin to flag for him, but he preferred to be given a white flagger.

288. Mr. Dunklin complained to Contempri about the racial hostility of the three drivers and, in particular, the hostility of Mr. Presswood.

289. Indeed, Contempri had an ongoing duty to prevent Mr. Presswood from acting for Contempri by discriminating against Mr. Dunklin through denying him opportunities to flag.

290. But Contempri did not take any remedial action, such as ordering Mr. Presswood to take Mr. Dunklin as a flagger, or disciplining Mr. Presswood for failing to do so.

291. To the contrary, Mr. Wildermuth, the supervisor responsible for obtaining and

assigning flaggers, actually aided and abetted the drivers in their racially hostility, by bypassing

Mr. Dunklin on several occasions and choosing only white flaggers for the most lucrative

overnight long-haul flagging trips.

292. In so doing, Mr. Wildermuth and Contempri signaled to the drivers that it was okay

to discriminate against Mr. Dunklin in favor of white flaggers.

293. In addition, according to Mr. Dunklin's information and belief, the company

president, Mr. Murphy, explicitly supported Mr. Wildermuth in passing over Mr. Dunklin for the

overnight long-haul flagging and selecting only white flaggers to do those jobs.

294. This racial animus by the truck drivers, as encouraged by Mr. Wildermuth, Mr.

Murphy, and perhaps other management for Contempri, was not only unpleasant for Mr.

Dunklin, it significantly altered his working conditions (in light of other racially motivated

obstacles discussed below) in that it prevented him from obtaining 40 hours per week of work

and it limited his opportunity even to do medium-haul flagging, with its desirable overtime pay.

295. Third, two key disciplinary actions were taken against Mr. Dunklin that contributed

to the racially hostile environment.

296. The first such disciplinary action was management's decision to suspend Mr.

Dunklin from working inside the plant, after what appeared to be a minor argument with Lisa

Hill in the painting department about putting a shop vacuum away.

297. Management understood that the severity of the discipline could not have been

justified by the minor nature of that dispute.  Therefore, management trumped up a false story,

alleging something much more severe – namely that Mr. Dunklin had threatened Ms. Hill with a

knife.

298. Even though this story was made up and known to be unfounded, it was maliciously

promulgated by Mr. Murphy (and perhaps other managers at Contempri), so that it became widely known in the plant.

299. The racial overtones of the story – a black man threatening to cut a white woman – were obvious, and appear to have been designed to appeal to the primal fears of white workers at the plant, about black men savaging white women.

300. Moreover, the mere fact that management took Ms. Hill's side in this way, by fabricating this story in order to justify showing favor to her over Mr. Dunklin, in a dispute in which the original argument was based upon her racial prejudices against him, demonstrates the pervasive nature of racial prejudice in the work place at Contempri.

301. The second such disciplinary action occurred when Mr. Murphy exploded in anger at Mr. Dunklin and cussed him out based on what appears to have been a minor misunderstanding.

302. Mr. Murphy did this yelling in front of Mr. Dunklin's co-workers.  In fact, in the context of Mr. Murphy's other racist actions, Mr. Dunklin infers and believes that he (Murphy) intended to humiliate him (Dunklin) and make him look stupid in front of his co-workers.

303. Moreover, the decision to suspend Mr. Dunklin indefinitely, rather than merely give him a reprimand or suspend him (say) for one day, is not comprehensible, except as an act of racism.

304. In light of the fact that Mr. Dunklin had already been suspended from working inside the plant, and in light of the fact that the company was unwilling to lift these suspensions, even more than a year later, this act by Mr. Murphy had the effect of saying to Mr. Dunklin that, as a black man, he was only fit to do the most menial maintenance work in the yard.

305. Fourth, Mr. Dunklin had three run-ins with Mr. Powell which were so severe in nature that, by themselves, they created a hostile environment for Mr. Dunklin at work.

306. The first of the three run-ins occurred when Mr. Powell charged at Mr.Dunklin with both fists balled up ready to strike, for practically no reason.

307. Mr. Powell's attack on Mr. Dunklin was observed by his supervisor, Mr. Wildermuth, who stepped in to stop Mr. Powell from hitting Mr. Dunklin.

308. However, neither Mr. Wildermuth nor Contempri took any disciplinary action against Mr. Powell at that time or made any attempt to deter him from future acts of violence towards Mr. Dunklin.

309. Mr. Powell had no personal stake in the changing of this tire.  Therefore, his pretext for the attack – that: (a) Mr. Dunklin and Mr. Riechman allegedly were not operating the zip-gun properly; and (b) Mr. Dunklin then said not to cuss at him – did not provide any reasonable justification for him to want to fight Mr. Dunklin.

310. Therefore, and also in light of Mr. Powell's other more minor acts of racial hostility towards Mr. Dunklin, Mr. Dunklin infers and believes that Mr. Powell would not have attacked him, but for the fact that he is black.

311. The second of the three run-ins occurred between October 25th and November 2nd, 2005.  Without provocation, Mr. Powell used his semi to run Mr. Dunklin and his flag truck off the highway and into the ditch.

312. Mr. Dunklin reported this incident to their supervisor, Mr. Wildermuth.  However, neither Mr. Wildermuth nor Contempri took any action to discipline or deter Mr. Powell.

313. The third of the three run-ins occurred in February, 2006, when Mr. Powell rammed Mr. Dunklin's flag truck with his semi and drove it approximately 12 feet backwards, while Mr. Dunklin was sitting inside.

314. Again, Mr. Dunklin reported this incident to Contempri.  It was also reported to

Contempri by one or more of Mr. Dunklin's co-workers, who observed the incident.

Furthermore, according to Mr. Dunklin's information and belief, the contractor from St. Louis

also called Contempri to complain about Mr. Powell.

315. Still, Contempri still did not take any action to discipline Mr. Powell or to protect

Mr. Dunklin from his acts of racial harassment.

316. Mr. Dunklin, himself, took action, in that he now refuses to flag for Mr. Powell

anymore.  But this just had the effect of further limiting the number of hours of work that Mr.

Dunklin could be given on any given week.

317. Mr. Dunklin suffered damages as a result in that:

>a. All of the acts of racial harassment, together, have combined to
>cause Mr. Dunklin a *de facto* demotion, in which he was excluded
>from working anything but the least desirable and lowest paying
>job at Contempri, namely working in the yard.

>b. All of the acts of racial harassment, together, have combined to
>cause Mr. Dunklin extreme stress at work to the point of causing
>him to have what amounts to a nervous breakdown.

>c. The physical threats and assaults by Mr. Powell have placed him
>in constant fear of physical harm at the work place, and finally led
>to his actually being hit by Mr. Powell in his semi.

318. There is ample basis for finding Contempri liable for these acts of harassment in

that:

>1. Members of management, including and especially Mr. Murphy,
>participated in the jokes and other hostile acts of harassment
>against Mr. Dunklin.

>2. Members of management, including both Mr. Murphy and Mr.
>Perry, suspended Mr Dunklin for almost two years, supposedly for
>threatening to cut Ms. Hill's throat, even though they knew that
>charge was completely unfounded.

3. Members of management, including Mr. Wildermuth, Mr. Murphy, and Mr. Perry, were informed on a number of occasions about various acts of racial harassment against Mr. Dunklin, but took no concrete actions and created no policy to prevent or reduce these acts of harassment, except to punish Mr. Dunklin for them by limiting him to the least desirable and lowest paid work at Contempri.

4. Members of management, including and especially Mr. Wildermuth, knew that Mr. Powell had assaulted Mr. Dunklin on two separate occasions, putting Mr. Dunklin in imminent fear for his physical safety, before the incident when Mr. Powell rammed Mr. Dunklin's flag truck with his semi.  Yet, they did nothing to prevent this last incident from occurring.

**WHEREFORE**, the Plaintiff requests the following relief:

a) That he be awarded compensatory damages against Contempri for the fear and stress that were caused in the amount of $250,000, together with the costs of these proceedings, including reasonable attorneys' fees;

b) That he be awarded back pay to compensate for the loss of work hours, the loss of overtime pay, the lower hourly pay rate that he received, and any loss of benefits, due to having been confined to working in the yard;

c) That Contempri restore him to a position inside the plant, and that he be granted seniority and paid at the rate that he would have been paid if he had not been suspended or demoted from working in the plant;

d) That Contempri rescind and remove from his employment file any record of his having been disciplined by Contempri for threatening Ms. Hill;

e) That he be awarded punitive damages in the amount of $500,000;

f) That he be awarded such other and further relief as his cause may require.

### Count III
### State Law Tort – Battery (against Mr. Powell and Contempri Homes)

319. The Plaintiff repeats and realleges the factual allegations of paragraphs 5-194, as if more fully set forth herein.

320. On or about February 15, 2006, Mr. Powell drove a prefabricated home from Contempri's Pinckneyville plant to St. Louis.  Mr. Dunklin traveled with Mr. Powell and served as his flagger.

321. When they reached the delivery site in St. Louis, Mr. Powell attempted to back up his semi in order to set down the prefabricated home in the proper location.

322. As Mr. Powell was maneuvering his semi, several employees from Contempri, including Mr. Dunklin, were standing near the semi on the driver's side.

323. The semi was facing Mr. Dunklin's unoccupied flag truck, at a distance of about 6 to 8 feet.

323. Mr. Powell decided that the flag truck was blocking his way, or making it more difficult for him to maneuver.  He therefore began yelling at Mr. Dunklin to move the flag truck.

324. Mr. Dunklin attempted to comply.  He started to walk in front of Mr. Powell's semi in order to cross over to the driver's side door of his flag truck.

325. But, as soon as Mr. Dunklin stepped out in front of the semi, Mr. Powell drove his truck forward straight at Mr. Dunklin.  Mr. Dunklin jumped back out of the way.

326. Mr. Dunklin tried at least two more times to cross between the two trucks, with the same result.  Each time Mr. Powell stepped in front of the semi, Mr. Powell drove his truck forward as if he was going to run Mr. Dunklin over.

327. Mr. Dunklin then decided to climb into his flag truck from the passenger's side, so that he would not have to walk around in front of Mr. Powell's truck.

328. But no sooner did Mr. Dunklin climb into the passenger's seat then Mr. Powell bore

down on him with his semi.

329. Mr. Powell did not stop.  He rammed his semi into Mr. Dunklin's flag truck with Mr. Dunklin inside, still sitting in the passenger seat.

330. Mr. Dunklin could only watch in helpless fear as Mr. Powell drove his flag truck backward approximately 12 feet.

331. By driving his truck right at Mr. Dunklin at least three times when Mr. Dunklin stepped in front of it, Mr. Powell demonstrated an intent either to hit Mr. Dunklin and cause serious harm, or else to frighten Mr. Dunklin and put him in imminent fear of serious physical harm.

332. By ramming Mr. Dunklin's flag truck while Mr. Dunklin was sitting in the passenger seat, Mr. Powell demonstrated an intent either to cause harm to Mr. Dunklin or else to make unwanted contact that would frighten Mr. Dunklin and put him in imminent fear of harm.

333. Furthermore, by ramming Mr. Dunklin's flag truck and driving it backwards for 12 feet with Mr. Dunklin inside, Mr. Powell actually did make contact with Mr. Dunklin, and the contact was, by nature, harmful and frightening.

334. Not only did Mr. Powell's act of ramming Mr. Dunklin's flag truck terrorize Mr. Dunklin at the time, it also caused him long-term psychological damage.

335. Mr. Powell was acting within the scope of his employment when he committed this battery against Mr. Dunklin.  Mr. Powell had driven his semi to St. Louis with Mr. Dunklin, at Contempri's request, for the purpose of delivering a prefabricated home to St. Louis.

336. Mr. Powell was in the process of maneuvering his semi into place, for the purpose of dropping off the prefabricated home for his employer (Contempri) at the time when the battery occurred.

337. Mr. Powell's battery against Mr. Dunklin was therefore incident to Mr. Powell's performance of his duties, as assigned by Contempri.

338. Therefore, Contempri should be held strictly liable for Mr. Powell's battery, under the doctrine of respondeat superior.

339. Furthermore, Contempri knew that Mr. Powell had assaulted Mr. Dunklin on two prior occasions, once with his fists and once with his truck.  Contempri's reckless indifference to these past problems gave Mr. Powell the idea that he could assault Mr. Dunklin at work with impunity.

340. Mr. Dunklin was harmed by the battery, as described in ¶ 334 above.  In addition, this battery was part of a pattern of abuse by Mr. Powell, including prior assaults with intent to commit battery, against Mr. Dunklin at the workplace.  This pattern of abuse was explicitly or implicitly permitted and condoned by Contempri.

**WHEREFORE**, the Plaintiff requests the following relief:

> a) That he be awarded compensatory damages against Mr. Powell and Contempri, jointly and severally, in the amount of $300,000, together with the costs of these proceedings, including reasonable attorneys' fees;

> b) That he be awarded punitive damages against Mr. Powell and Contempri, jointly and severally, in the amount of $600,000;

> c) That he be awarded such other and further relief as his cause may require.

### Count IV
### State Law Tort – Negligent Supervision (against Contempri Homes)

341. The Plaintiff repeats and realleges the factual allegations of paragraphs 5-194, as if more fully set forth herein.

342. The Plaintiff further repeats and realleges its allegations of paragraphs 320-337,

which can be summarized to state that: On or about February 15, 2006, Defendant Powell committed a battery against Mr. Dunklin, while delivering a prefabricated house to St. Louis for their mutual employer, Contempri Homes.

343. The battery in question was the result of Mr. Powell's actions in: (1) driving his semi at Mr. Dunklin at least three times as Mr. Dunklin tried to cross over in front of the semi, to get to his flag truck; and (2) ramming Mr. Dunklin's flag truck and driving it approximately 12 feet backward after Mr. Dunklin got back into his truck.

344. Mr. Dunklin was harmed thereby. Not only did Mr. Powell's act in ramming Mr. Dunklin terrorize him at the time, it also caused him long-term psychological damage.

345. Furthermore, this act of aggression by Mr. Powell against Mr. Dunklin did not or should not have come as a surprise to Contempri. It was part of a long-term course or pattern of action by Mr. Powell in which he attempted to intimidate or terrorize Mr. Dunklin, apparently just because he is black.

346. Contempri was fully aware that Mr. Powell had threatened Mr. Dunklin with imminent physical harm during work on at least two prior occasions.

347. In April or May, 2005, Mr. Powell attacked Mr. Dunklin without provocation. He came at Mr. Dunklin with both fists balled up, and was only prevented from battering Mr. Dunklin by the quick intervention of their supervisor, Mr. Wildermuth.

348. Some time between October 25th and November 2nd, 2005, Mr. Powell drove his semi straight at Mr. Dunklin's flag truck on the far right side of the highway and literally ran Mr. Dunklin off the road and into a ditch.

349. This act of aggression was reported immediately by Mr. Dunklin to their supervisor, Mr. Wildermuth.

350. Mr. Wildermuth's knowledge of these two incidents can be attributed to Contempri because Mr. Wildermuth was acting as Contempri's agent when he learned about each incident.

351. Furthermore, the president of the company, Mr. Murphy, and the owner, Mr. Perry, were informed about both incidents.

352. Yet, Contempri took no disciplinary action against Mr. Powell on either occasion. Nor did Contempri even make an effort to keep Mr. Powell away from Mr. Dunklin.

353. After Mr. Powell's first unprovoked attack on Mr. Dunklin with his balled up fists, Contempri could have chosen to fire Mr. Powell for his aberrant and dangerous behavior.

354. In deciding to keep Mr. Powell in their employ, Contempri took on a positive duty to prevent the recurrence of such attacks.  But Contempri literally did nothing to meet this duty.

355. The duty became even more imperative after the second unprovoked attack, in which Mr. Powell ran Mr. Dunklin off the highway and into a ditch.

356. Contempri still did nothing.

357. This failure by Contempri to take any corrective action in the face of such an obvious danger showed either a willful disregard or else a reckless indifference to Mr. Dunklin's safety on the job.

358. Not only should Contempri have known that a third attack by Mr. Powell was likely, given the previous two, but it was entirely foreseeable that Mr. Powell might choose to use his semi as his weapon in attacking Mr. Dunklin, since Mr. Powell had already used that tactic once before.

359. It would not have been a great burden for Contempri to try to prevent Mr. Powell from using his position as a driver for Contempri as a means to attack Mr. Dunklin.

360. For example, a simple suspension (without pay) after the first incident probably

would have caught Mr. Powell's attention, and given him incentive to control his hostility.

361. If that did not succeed, an order telling Mr. Powell to stay away from Mr. Dunklin during work would have been effective.

362. Contempri took no such protective action when it could have and should have.

363. Contempri's inaction, in the face of a clear duty to act, was egregiously negligent and inexcusable, and ultimately enabled Mr. Powell to commit his battery against Mr. Dunklin.

**WHEREFORE**, the Plaintiff requests the following relief:

> a) That he be awarded compensatory damages against Contempri, in the amount of $250,000, together with the costs of these proceedings, including reasonable attorneys' fees;
>
> b) That he be awarded punitive damages against Contempri in the amount of $600,000;
>
> c) That he be awarded such other and further relief as his cause may require.

## Count V
## State Law Tort – Defamation (against Mr. Murphy and Contempri)

364. The Plaintiff repeats and realleges the factual allegations of paragraphs 5-194, as if more fully set forth herein.

365. In early March, 2005, Mr. Murphy, Contempri's president, either made up a story that Mr. Dunklin had threatened to cut Ms. Hill's throat with a knife, or else promulgated this story knowing that it was unfounded.

366. Mr. Murphy made no attempt to investigate the alleged incident to see whether it had in truth occurred.  For example, he did not attempt to find out if Mr. Dunklin even carried a knife at work.

367. Mr. Murphy told Mr. Dunklin about the charges, and Mr. Dunklin denied them, but

Mr. Murphy did not tell Mr. Dunklin the source of the charges, or give him any chance to defend himself.

368. Without further investigation, Mr. Murphy suspended Mr. Dunklin from working in the plant indefinitely, and ordered him not to come within 50 feet of Ms. Hill.

369. Mr. Murphy repeated his accusation about Mr. Dunklin having threatened to cut Ms. Hill's throat to the company owner, Mr. Perry, and at least some of Contempri's supervisors, including Mr. Wildermuth and Mr. White.

370. In addition, the accusation became known, among many of the workers inside the plant.

371. The accusation against Mr. Dunklin, as reported by Mr. Murphy, if true, would appear to allege that Mr. Dunklin committed a crime by threatening to attack Ms. Hill with a dangerous weapon.

372. Thus, Mr. Murphy's unfounded and false accusation was deliberately calculated to prejudice Mr. Dunklin in his trade by making him appear to be a dangerous and untrustworthy employee inside the plant.

373. This constituted defamation *per se*.

374. In addition, the defamation did cause actual damage to Mr. Dunklin, in that he was limited, as a result, to working only in the yard, with less pay per hour, fewer hours per week of work, and no possibility for advancement.

375. The act of defamation further encouraged other employees to ostracize Mr. Dunklin, because of his race, and commit other harmful acts against him.

376. Given the seriousness of the knife accusation, Mr. Murphy exhibited a reckless disregard for the rights of Mr. Dunklin in that he failed to conduct any investigation, or give Mr.

Dunklin a chance to confront and question his accuser, before Mr. Murphy decided to accuse Mr.

Dunklin.

377. Furthermore, Mr. Murphy acted with actual malice by promulgating this accusation,

knowing that it was unfounded.

**WHEREFORE**, the Plaintiff requests the following relief:

a) That he be awarded compensatory damages against Mr. Murphy and Contempri, in the amount of $200,000, together with the costs of these proceedings, including reasonable attorneys' fees;

b) That he be awarded punitive damages against Mr. Murphy and Contempri, in the amount of $600,000;

c) That he be awarded such other and further relief as his cause may require.

_____Respectfully Submitted,

Paul Dunklin,
PLAINTIFF

Dated: February 15, 2007            By:    s/Richard Fedder
                                           Attorney for Plaintiffs

Richard Fedder
ARDC#6272204
Milwood Executive Suites
3200 Fishback Rd.
Carbondale, IL 62901
Telephone: (618) 529-5229